BUTLER COUNTY BAR ASSOCIATION *v.* SCHOONOVER.

[Cite as *Butler Cty. Bar Assn. v. Schoonover,*
105 Ohio St.3d 472, 2005-Ohio-2816.]

(No. 2004-2079—Submitted February 16, 2005—Decided June 22, 2005.)

---

**Per Curiam.**

{¶ 1} Respondent, Paul Schoonover, of Oxford, Ohio, Attorney Registration No. 0039600, was admitted to the practice of law in Ohio in 1988. On August 11, 2003, relator, Butler County Bar Association, charged respondent with one count of professional misconduct. A panel of the Board of Commissioners on Grievances and Discipline heard the cause and, based on the parties' comprehensive stipulations and other evidence, made findings of misconduct and a recommendation, all of which the board adopted.

## Misconduct

{¶ 2} At all times relevant to the complaint, respondent maintained an office in Oxford, Ohio, but lived in another city. From approximately August 2001 through August 2002, respondent lived in Akron. After that, he "divided his time between Chicago, New York, and Akron," apparently to be with family and friends. Respondent also did not keep regular hours, had no office staff, and checked for messages only once a week or so, leading the board to agree with one panel member who described respondent as "dabbling in the practice of law."

{¶ 3} A married couple consulted respondent in April 2002 about establishing a guardianship for the husband's uncle. The uncle had raised his nephew, and when the uncle's health began to fail, he invited the couple to live with and look after him. Respondent quoted a $700 fee, plus court costs, to set up the guardianship, deciding not to charge a higher amount because he had no experience with guardianships and wanted to learn about them. On April 11, 2002, the couple paid respondent $350 to initiate the guardianship proceedings.

{¶ 4} Although respondent met with his clients several times throughout April and May 2002, took steps toward having the uncle's competence evaluated, and later prepared many of the documents necessary to establish a guardianship, he did not file for the guardianship before the uncle died on July 19, 2002. To explain the delay to the panel, respondent reported that he had advised the couple to wait to file the guardianship until the uncle's lawyer had departed the country on an annual summer trip to Europe. (Respondent knew that the uncle's lawyer would be taking this annual trip because he had been associated with him from 1997 to 1999. During that time, respondent represented the uncle in unrelated matters.) Respondent explained that he had proposed this strategy of waiting because he feared that the uncle might ask his lawyer to contest the guardianship, and respondent did not want to see his clients "waste their time and money in a contest if it could be avoided by waiting until after [the uncle's attorney] left."

{¶ 5} The uncle suffered injuries from a fall in early June 2002, which necessitated his admission to a nursing home and, in July, surgery. Before the fall, neither respondent nor his clients had been able to obtain an expert opinion that the uncle was incompetent. The uncle was eventually evaluated, however, and on June 24, 2002, a physician faxed his report to respondent for review. Respondent claims that he did not receive the report. The evaluation was also mailed to respondent on July 1, 2002, but its delivery was delayed due to an incorrect address.

{¶ 6} Between June 24, 2002, and July 19, 2002, the couple attempted to contact respondent by telephone approximately 35 times, but his voice mail was usually full, so they were not always able to leave messages. They visited

respondent's office, twice leaving messages on his door, and they tried to locate him through a courthouse across the street from his office, all without success. Respondent realized that his clients were having difficulty reaching him; however, he retrieved messages at his Oxford office during March 2002 to September 2002, on average, only about twice each month. During July 2002, he did not go to the office at all.

{¶ 7} Respondent did not learn of the uncle's death until early August 2002, after he mailed documents to his clients to begin the guardianship. Respondent had not spoken with his clients since June 21.

{¶ 8} In August 2002, the couple wrote to respondent asking that he refund the $350 they had paid him. The couple also informed respondent that they were filing a grievance with relator. Respondent did not refund the couple's money until March 2004.

{¶ 9} Relator's investigation also revealed that respondent did not have malpractice insurance, nor did he advise his clients that he lacked this coverage. In July 2004, respondent obtained malpractice insurance.

{¶ 10} The board found that respondent had violated DR 1–102(A)(6) (barring a lawyer from engaging in conduct adversely reflecting on his fitness to practice law), 1–104(A) and (B) (requiring a lawyer to notify clients in writing of inadequate professional-liability insurance and to retain a signed copy of the notice), and 6–101(A)(3) (barring a lawyer from neglecting an entrusted legal matter). Although the parties had stipulated to a violation of DR 2–110(A)(3) (requiring a lawyer to promptly return unearned fees upon request), the board found that even though respondent did not file the guardianship documents, he had earned his fee through meetings and document preparation. The board also found no violation of DR 1–102(A)(5) (barring conduct prejudicial to the administration of justice) and 7–101(A)(2) (prohibiting an attorney from intentionally failing to carry out a contract for professional employment), despite the parties' stipulations to violations of these rules.

## Sanction

{¶ 11} In recommending a sanction for this misconduct, the board considered the aggravating and mitigating circumstances of respondent's case. See Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). In mitigation, the board found that respondent's mother, with whom he had been very close, died in March 2002. Soon after, respondent began experiencing anxiety, for which he was prescribed medication. Respondent no longer takes this medication and does not claim any chemical dependency or mental illness.

{¶ 12} The board found no aggravating factors. Respondent had no prior disciplinary record and had not engaged in a pattern of misconduct, and his misconduct was not motivated by dishonesty or self-interest. BCGD Proc.Reg. 10(B)(1)(c) and (2)(a) and (c). Respondent also cooperated in the disciplinary process, admitted the wrongful nature of his conduct, did not harm his clients financially, and made restitution. BCGD Proc.Reg. 10(B)(1)(g) and (2)(c). The board found mitigating that some of respondent's other clients had expressed appreciation for his dedication to their cases and that he had apologized for his wrongdoing. BCGD Proc.Reg. 10(B)(2)(e).

{¶ 13} At the panel hearing, relator recommended that respondent's license to practice be suspended indefinitely. In his hearing brief, respondent suggested a public reprimand. Accepting the panel's recommendation, the board recommended that respondent be suspended from the practice of law for six months, with the entire suspension stayed on the conditions that (1) respondent provide relator with evidence of his malpractice insurance and (2) he submit to monitoring under relator's direction for one year after the final order in his case. Neither relator nor respondent has objected to the board's findings or recommendation.

{¶ 14} Upon review, we agree that respondent violated DR 1–102(A)(6), 1–104(A) and (B), and 6–101(A)(3), as found by the board, and that a six-month suspension, stayed on conditions, is appropriate.

{¶ 15} Accordingly, for his violation of DR 1–102(A)(6), 1–104(A) and (B), and 6–101(A)(3), respondent is hereby suspended from the practice of law for six months. The entire six-month suspension is stayed, however, on the conditions that respondent (1) within 30 days of our order provide relator with evidence of his malpractice insurance and (2) submit to monitoring at relator's direction for one year from the date of our order. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

———

Kathleen D. Romans and J.C. Shew, for relator.

Paul Schoonover, pro se.